UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

UNITED STATES OF AMERICA,
    Plaintiff,

v.                                Cr. No. 14-093-01M

KIPLAGATT STEWART,
    Defendant.

## MEMORANDUM AND ORDER

JOHN J. McCONNELL, JR., District Judge.

On September 7, 2012, agents from the Bureau of Alcohol, Tobacco, and Firearms (ATF), along with Providence Police officers and members of the Fugitive Task Force, arrested Defendant Kilplagatt Stewart at 132 Oakland Avenue in Providence, Rhode Island ("the apartment"). After Mr. Stewart was removed from the apartment, ATF Special Agent Edward Troiano spoke with another individual living in the apartment, Jonas Fernandez, who gave Agent Troiano a tour of the apartment and oral and written consent to search it, including the room where Mr. Stewart was staying. Agent Troiano did not have a search warrant.

Pursuant to the search of that bedroom, Agent Troiano found medical supplies, some documents including Mr. Stewart's state-issued identification, and an unbound roll of bills totaling $6000 in the open pocket of a jacket hanging in the open closet. The $6000 is alleged to be the proceeds of a September 3, 2012 armed home invasion in West Warwick that Mr. Stewart is accused of committing and the medical supplies support the police's information that Mr. Stewart was shot during that robbery. Mr. Stewart moves to suppress that evidence on several grounds. (ECF No. 18). The Court has reviewed extensive briefing and held an

1

evidentiary hearing where Agent Troiano, Mr. Fernandez, and another roommate Lawrence Livingstone testified. Based on the totality of that evidence, the Court denies Mr. Stewart's motion.

I.  **FACTUAL BACKGROUND**

The Court makes the following factual findings relevant to its determination of Mr. Stewart's motion.

The West Warwick Police Department obtained an arrest warrant for Mr. Stewart and federal agents obtained a warrant to track his cell phone on September 4, 2012 for his role in the armed home invasion. Two days later, Agent Troiano tracked Mr. Stewart's phone to an area of Union Avenue in Providence. He went to that location, saw Mr. Stewart get into a car, and followed it. He lost the car in traffic that day, but tracked Mr. Stewart's cell phone to the apartment on Oakland Avenue the next day, September 7, 2012. Agent Troiano observed the car that he had seen Mr. Stewart riding in parked at the apartment. Agent Troiano researched the address on Accurint[1] and learned that an individual named Jose Fernandez was associated with that apartment, but cellular data continued to show that Mr. Stewart's cell phone was located at the apartment. Based on this information and his observations, Agent Troiano believed that Mr. Stewart would be located at the apartment.

Law enforcement officers prepared to execute the arrest warrant at the apartment. The car was still there. They set up a perimeter and, between noon and 12:30, knocked loudly on the doors, identified themselves as police, and demanded entry. No one answered. Law enforcement continued to knock on the door. One of the officers observed an interior curtain

---

[1] "Accurint is an online database that contains up-to-date information about postal addresses." *United States v. Colon*, 386 Fed. Appx. 229, 231 n.1 (3d Cir. 2010).

move, leading them to conclude that someone was inside, but their knocking still went unanswered. After approximately five minutes, Task Force members used a battering ram to enter the apartment by force. Officers secured the scene and attempted to locate Mr. Stewart. He was found on the second floor in the hallway near a bedroom. The bedroom door was open, and a Task Force member saw the medical supplies on the television stand through the open door. Mr. Stewart had reportedly been shot four days earlier, fleeing the scene of the armed home invasion in West Warwick. Mr. Stewart was patted down, his phone was seized, and he was taken to the Providence Police Department.

The other occupants of the apartment, Mr. Fernandez, Lawrence Livingstone, and Sheila Larbi, were taken to the kitchen during the execution of the arrest warrant. They were all handcuffed.[2] Recognizing Mr. Fernandez's name from the Accurint search, Agent Troiano began to question him about the apartment, asking who was on the lease and about his relationship with Mr. Stewart. It is clear from both Mr. Fernandez's testimony and that of Agent Troiano that Mr. Fernandez was nervous and uncomfortable during the entire encounter, concerned that any association or involvement with the crime Mr. Stewart had been arrested for would affect his employment with Electric Boat. Nevertheless, Mr. Fernandez was cooperative and told Agent Troiano that he was the only person on the lease. Mr. Fernandez told Agent Troiano that he and Mr. Stewart were friends and that Mr. Stewart had been staying in the apartment for three days. He showed Agent Troiano the second floor bedrooms, indicating who lived in each bedroom. When pointed to the bedroom where Mr. Fernandez said Mr. Stewart

---

[2] Both men testified that they remained in handcuffs the entire time the police were at the apartment. Agent Troiano testified that he does not recall when the men's hands were released.

was staying, Agent Troiano observed the medical supplies on the television stand through the open door of the room.

Agent Troiano asked Mr. Fernandez for permission to search the apartment and he agreed. Agent Troiano presented Mr. Fernandez with a consent form for him to read and sign. After Agent Troiano reviewed the form with him and ascertained that Mr. Fernandez understood what he was signing, Mr. Fernandez affirmed his oral consent and signed the form. At no time did Mr. Fernandez object to the search or express concern or a lack of understanding of what he was signing. The Court finds that Mr. Fernandez freely gave his consent. While other law enforcement searched the rest of the apartment, Agent Troiano searched the bedroom where Mr. Fernandez indicated that Mr. Stewart had been sleeping for the previous three days. He seized the medical supplies that he had observed earlier along with some documents, including Mr. Stewart's state-issued identification card showing residence at an address other than 132 Oakland Avenue, from the television stand. Agent Troiano also searched the open closet and the items hanging therein. He testified that he started at one end of the closet and individually began to scan through the clothing. When he got to a black jacket, he was able to see a roll of money protruding from a bulging jacket pocket. Believing it was evidence of the armed robbery where approximately $15,000 was stolen, Agent Troiano seized the currency.

The apartment search ended, but the investigation of the West Warwick robbery continued. Agent Troiano followed up with Mr. Fernandez a few days later. Mr. Fernandez did not have any new information to add to Agent Troiano's investigation. He was informed, however, that Agent Troiano felt obligated to report to Electric Boat that Mr. Stewart was

present at Mr. Fernandez's apartment and the fact that drugs[3] were found there because Mr. Fernandez had a security clearance.[4] Agent Troiano did speak to someone at Electric Boat and testified that he told that person that he did not believe Mr. Fernandez was involved with the criminal activity. Mr. Fernandez testified that he was still employed at Electric Boat as of the hearing on this motion.

Mr. Stewart was ultimately charged with conspiracy to commit a Hobbs Act robbery (18 U.S.C. § 1951(a)) and Use of a Firearm in Furtherance of a Crime of Violence (18 U.S.C. § 924(c)(1)(A)(i)) for his role in the West Warwick armed robbery. He moves to suppress the evidence found pursuant to the warrantless search, specifically the roll of currency and the medical supplies.

## II. LEGAL ANALYSIS

Mr. Stewart argues that the evidence should be suppressed on three grounds: 1) entry into the apartment was unlawful; 2) Mr. Fernandez did not have the authority to consent to search Mr. Stewart's room and possessions and that Mr. Fernandez's consent was coerced; and 3) the scope of the search, including the closet and its contents, was beyond the scope of the consent.

### A. Entry was Lawful

Mr. Stewart argues that law enforcement officers' entry into the apartment was unlawful because it was not based on reasonable belief that he lived there. The Government disagrees,

---

[3] The police found drugs in Mr. Livingstone's bedroom during the search. Those items are not at issue in this motion.

[4] In his original memorandum, Mr. Stewart asserts that Agent Troiano coerced Mr. Fernandez by threatening to call Electric Boat to tell his employer that he was involved in criminal activity unless he consented to the search on September 7, 2012. (ECF No. 18-1 at 4). Mr. Fernandez later recanted that assertion, saying that he was confused. (ECF No. 19 at 1). In fact, the conversation about contacting Electric Boat did not involve a threat to reveal Mr. Fernandez's non-existent role in the robbery and took place a few days after the search at Agent Troiano's office.

5

citing evidence that the officers considered prior to entering the apartment and First Circuit case law.

"[P]olice armed with an arrest warrant for a suspect founded on probable cause may enter the dwelling of that suspect when 'there is reason to believe [he] is within.'" *United States v. Graham*, 553 F.3d 6, 12 (1st Cir. 2009) (quoting *Payton v. New York*, 445 U.S. 573, 602 (1980)). It is not fatal to the warrant if it is later learned that the suspect does not actually live at the dwelling "so long as the police 'reasonably believed' prior to entry that he (1) resided at the apartment and (2) would be present." *Graham*, 553 F.3d at 12 (citing *United States v. Weems*, 322 F.3d 18, 22 (1st Cir. 2003)). "Subsequent to *Payton*, courts have held that even where it is discovered after entry that the dwelling *is not* the suspect's, the initial entry may be justified under *Payton* provided the police reasonably believed, prior to entry, that the suspect *did* reside at the dwelling." *Graham*, 553 F.3d at 12 (citing *United States v. Lovelock*, 170 F.3d 339, 343-44 (2d Cir. 1999); *United States v. Risse*, 83 F.3d 212, 216 (8th Cir. 1996); *United States v. Route*, 104 F.3d 59, 63 (5th Cir. 1997)).

The Court finds that the police reasonably believed prior to entry that Mr. Stewart resided at the apartment and would be present on September 7, 2012. Agent Troiano testified that the car he observed Mr. Stewart get into the day before was parked at the apartment. The car was still there when law enforcement arrived the next day to execute the warrant. Mr. Stewart's cell phone was tracked to the apartment up to the moment of entry. Upon arriving at the apartment, the agents repeatedly knocked on the door and no one answered, even after they saw a window curtain move, a strong indicator that someone was inside, but there was a reason he or she did not want to open the door to police. While this evidence does not amount to a utility bill or a police report associated with the apartment with Mr. Stewart's name on them, *Graham*, 553 F.3d

at 13 (police do not need such "rock-solid indicators of residence"), the Court finds that, based on the totality of the evidence considered in the context of the armed robbery investigation, the agents had a reasonable belief that Mr. Stewart resided at the apartment and was present there on September 7, 2012. *See Lovelock*, 170 F.3d at 344. The fact that police learned from Mr. Fernandez after entry that Mr. Stewart had only been staying at the apartment for three days is not fatal to the Court's determination that the police reasonably believed Mr. Stewart resided there.[5] *See Graham*, 553 F.3d at 13.

Mr. Stewart relies heavily on *Steagald v. United States*, a case where the Supreme Court found that a resident of a dwelling (not the subject of the arrest warrant) had standing to challenge the failure to obtain a search warrant before executing an arrest warrant for a guest at his residence. 451 U.S. 204 (1981). However, the First Circuit Court of Appeals in *Graham* determined that the holding in *Steagald* was not instructive to a case, like this one, where police enter a dwelling with an arrest warrant and a reasonable belief of residence. *Graham*, 553 F.3d at 14. The Court finds Agent Troiano's testimony on this point to be credible and persuasive that execution of the arrest warrant at the apartment was based on a reasonable belief, rooted in the observation of seasoned agents, cell phone tracking information, and the presence of the car at the apartment that Mr. Stewart rode in the day before, that Mr. Stewart resided at and was present at the apartment.

---

[5] Mr. Stewart argues that Agent Troiano and the officers could not have reasonably believed that he lived at the apartment based on what they observed and knew before they entered even though he later argues in order to defeat Mr. Fernandez's authority to consent that he was, in fact, a permanent occupant. Mr. Livingstone and Mr. Fernandez testified that Mr. Stewart always lived with them. These two arguments are incongruent and undermine both positions and the testimony in support.

Moreover, Mr. Fernandez's and Mr. Livingstone's testimony about how law enforcement officers entered was not credible. They both testified that they did not respond to knocking at their door because they thought the police were knocking on their neighbor's door. Mr. Livingstone testified that he heard a commotion outside, but instead of investigating, he went to the basement to retrieve his laundry. Instead of looking outside to determine the source of the commotion or knocking on the neighbor's door, Mr. Fernandez testified that he went upstairs to wake Mr. Stewart and Ms. Larbi. The fact that the occupants avoided opening the door to police when the police clearly and loudly identified themselves and sought entry, would cause an officer to reasonably believe, along with the additional information available to them, that the suspect, Mr. Stewart, was there. Therefore, the Court finds that entry into the apartment was lawful.

### B. Mr. Fernandez was Authorized to Consent and his Consent was Voluntary

Now that the Court has determined that entry into the apartment was lawful, it must turn to whether Mr. Fernandez's consent to the search of the bedroom where Mr. Stewart was staying was authorized and valid. "[A] warrantless search may be conducted with the voluntary consent of a person authorized to give such consent." *United States v. Chaney*, 647 F.3d 401, 405-06 (1st Cir. 2011). "Whether consent is voluntary is to be determined by examining the totality of the circumstances, including the interaction between the police and the person alleged to have given consent." *United States v. Weidul*, 325 F.3d 50, 53 (1st Cir. 2003). Because without consent or exigent circumstances, a warrantless search of a home violates the Fourth Amendment, *see Steagald*, 451 U.S. at 211-12, the Court must answer two questions: first, what was Mr. Stewart's residency status in the apartment - was he a permanent resident, making Mr. Fernandez a joint occupant without authority to consent to search Mr. Stewart's bedroom or

was he a mere guest of the lessees without any expectation of privacy in the room in which he was staying, and second, was the authorized consent voluntary or the product of coercion? Because the Court finds that Mr. Fernandez was in a position to authorize the search and was not coerced, Mr. Stewart's argument fails.

### 1. Authority to Consent

"The government bears the burden of demonstrating that consent was validly obtained. This entails a showing that an appropriate person voluntarily gave a valid consent." *United States v. Romain*, 393 F.3d 63, 69 (1st Cir. 2004) (internal citation omitted). A third party's consent is valid if the Court finds he or she has actual or apparent authority to consent to the search. *United States v. Meada*, 408 F.3d 14, 21 (1st Cir. 2005). Actual authority exists when the "consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *United States v. Matlock*, 415 U.S. 164, 170 (1974). "Common authority" rests on "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* at 171 n.7. Where law enforcement reasonably relies in good faith on a third party's representations that he or she has the authority to consent, apparent authority exists. *Illinois v. Rodriguez*, 497 U.S. 177, 186–188 (1990). "'As with other factual determinations bearing upon search and seizure, determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment ... warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?'" *Meada*, 408 F.3d at 21 (quoting *Rodriguez*, 497 U.S. at 188).

Based on the hearing testimony, the Court finds that Agent Troiano knew the following at the time he asked Mr. Fernandez for consent: Mr. Fernandez told Agent Troiano that he was the only person on the lease; Mr. Stewart was not on the lease; the Accurint search showed that Mr. Fernandez was associated with the apartment; Mr. Stewart was an old friend of Mr. Fernandez and needed a place to stay; and Mr. Stewart had only been staying at the apartment for three days. Agent Troiano also observed on the tour of the apartment that the bedroom door in question was not only wide open to the hallway, but it was unlocked and incapable of being locked. The Court finds that these facts support Agent Troiano's reasonable good faith conclusion that, when he asked Mr. Fernandez if he could search the apartment, Mr. Fernandez had the actual authority to consent to that search because he had common authority over a guest bedroom as a co-habitant of the apartment. Even if he did not have actual authority, he certainly had apparent authority based on his representations to and conduct with Agent Troiano, specifically that he said he was the only person on the lease, that he willing gave Agent Troiano a tour, and described the nature of Mr. Stewart's temporary occupancy of the apartment.

While Mr. Stewart had a reasonable expectation of privacy as a guest at the apartment, *Minnesota v. Olson*, 495 U.S. 91, 98-99 (1990), the Court concludes that the bedroom was an extra bedroom to which any one of the three lessees had access and could have consented to a search. Mr. Fernandez and Mr. Livingstone testified that they viewed the bedroom as belonging to Mr. Stewart, but that belief is not credible in light of the short period of time he had been staying there, presumably to recover from his injuries, and the fact that Mr. Stewart was not on

the lease. Moreover and significantly, Mr. Stewart's State of Rhode Island issued identification[6] found in the bedroom listed Mr. Stewart's residence at a different address, not the apartment. The Court finds Agent Troiano's testimony to be credible and his actions to be reasonable and in good faith in light of the facts as he knew them at the time he asked for consent to search the apartment such that the warrantless search of the apartment did not violate the Fourth Amendment. *Rodriguez*, 497 U.S. at 186 ("Whether the basis for such [apparent] authority exists is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably.")

### 2. Consent was Voluntary

Mr. Stewart argues that, even if he had authority to consent, Mr. Fernandez's consent to search was based on unlawful coercion and therefore cannot excuse a warrantless search. The Government counters that Mr. Fernandez freely gave consent, not once but twice, making the search constitutionally permissible.

On the issue of coercion, the Court heard two different versions of the circumstances surrounding the soliciting and giving of consent. It heard from Mr. Fernandez, who testified that he only consented because he was afraid he would be charged with a crime if he did not and that Agent Troiano threatened to trash the apartment if he had to come back with a warrant. Mr. Stewart also argues that the nature of the operation - that law enforcement forcibly entered the house with guns drawn and the length of time spent at the apartment, intimating that they were not going to leave until given the authority to search - supports his contention that consent was coerced. Agent Troiano painted a different picture - that of a willing and cooperative, but

---

[6] The State of Rhode Island issued that identification card on June 13, 2012, approximately three months before the search, and it expired on December 13, 2012.

11

nervous Mr. Fernandez who knew he was not the target of the investigation after the police arrived and arrested Mr. Stewart, and who spoke freely to Agent Troiano about his status in the apartment, the apartment's layout, and his relationship with Mr. Stewart. When asked if he would consent to the search, Mr. Fernandez did so without hesitation. His resolve to consent did not waver when Agent Troiano left him to find a written consent form; he read and signed the form, confirming for a second time that he agreed to let the police search. In fact, Mr. Fernandez further cooperated by meeting with Agent Troiano at his office a few days later.

The Court finds truth in both versions and that the differences are not material to the Court's ultimate conclusion on coercion. It is understandable that an individual would be nervous and feel intimidated when law enforcement officers force themselves into his apartment and arrest a friend. But that is not enough to find that that person was coerced into signing a consent form. *United States v. Barnett*, 989 F.2d 546, 556 (1st Cir. 1993) (finding that a coercive atmosphere of a police raid did not render consent involuntary). The Court finds, based on the totality of the interaction between Mr. Fernandez and Agent Troiano, and finding Agent Troiano's testimony on this matter logical and credible, that Mr. Fernandez's consent was voluntary and valid. Therefore, the apartment search resulting from the consent was not coerced and did not violate the Fourth Amendment of the Constitution.

### C. The Closet and Jacket Pocket was within the Scope of Consent

Mr. Stewart's final argument is that, even if the search was authorized and valid, the scope of the search exceeded Mr. Fernandez's authority and therefore, the medical supplies[7] and

---

[7] The medical supplies were in plain view on the television stand in the bedroom. *United States v. Sanchez*, 612 F.3d 1, 4-5 (1st Cir. 2010) ("A warrantless seizure is lawful under the plain view doctrine as long as (i) the police officer who effects the seizure lawfully reaches the vantage point from which he sees an object in plain view; (ii) probable cause exists to support his seizure

money roll must be suppressed. There are essentially two specific areas of the search that Mr. Stewart challenges here – the closet itself and the pocket of the jacket hanging therein. He argues that both areas were beyond the scope of Mr. Fernandez's authorized consent because, as a closed container, Mr. Stewart had a higher expectation of privacy in a closet and jacket pocket. Agent Troiano, he argues, could not have reasonably believed that Mr. Fernandez had authority to consent to a search of his pocket. The Government disagrees, arguing that the search, specifically the closet and jacket pocket, was within the general scope of consent because the closet door was open, the jacket pocket was bulging open, and the money roll was visible due to its bulk.

A warrantless search must remain within the scope of the consent granted. *United States v. Marshall*, 348 F.3d 281, 286 (1st Cir. 2003). The burden, again, is on the Government to prove that Agent Troiano's search did not exceed the scope of consent given. *United States v. Melendez*, 301 F.3d 27, 32 (1st Cir. 2002). In considering the issue of the scope of consent given, the Court must apply objective reasonableness test and ask, "what would the typical reasonable person have understood by the exchange between the officer and the subject?" *Id.* (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). Therefore, a court must look "beyond the language of the consent itself, to the overall context, which necessarily encompasses contemporaneous police statements and actions." *Turner*, 169 F.3d at 87. Context is important

---

of that object; and (iii) he has a right of access to the object itself.") The Court has concluded that law enforcement "lawfully reached the vantage point" in the apartment where he saw the medical supplies on the television stand and "a lawful right" to take the supplies, meeting the first and third elements. The second element is also satisfied. Probable cause existed to support taking the medical supplies because they are evidence of the West Warwick home invasion. Police had information that Mr. Stewart had been shot fleeing the scene of the crime and had not sought medical attention at a hospital for a gunshot wound. The presence of the medical supplies in the bedroom where he had been staying since the home invasion supports that information and his role in the crime.

because "[t]he scope of a [consensual] search is generally defined by its expressed object." *Jimeno*, 500 U.S. at 251. "Notwithstanding the fact-specific nature of an inquiry into the scope of consent, some general principles remain in play. One such principle is relevant here: 'a general consent to search ... subsumes the specific consent to search any easily accessible containers' that may be located within the designated search area." *United States v. Stierhoff*, 549 F.3d 19, 24 (1st Cir. 2008) (quoting *United States v. Zapata*, 18 F.3d 971, 977 (1st Cir. 1994)).

First turning to the open closet, the Court finds that it was an "easily accessible container" located within the bedroom and therefore was subsumed into Mr. Fernandez's general consent to search the apartment and the bedroom specifically. Moreover, it was objectively reasonable for the agent to believe that the closet was within the scope of the consent because Mr. Fernandez did not put any limitations on the search of the room. *See Jimeno*, 500 U.S. at 251. The closet door was open and there was no locking mechanism to suggest that the room's occupant intended for it to remain closed and locked. Therefore, the closet was within the scope of the general consent to search.

While the Court finds that Mr. Fernandez's general consent extended to the closet, that does not necessarily mean that all of the items within can be searched because "[w]hen a third party grants consent to search a room he or she is not necessarily consenting to a search of the closed items within the room." *United States v. Robinson*, 999 F. Supp. 155, 161-62 (D. Mass. 1998) (citing *United States v. Karo*, 468 U.S. 705, 725 (1984) (O'Connor concurring) (When a private container, to which the homeowner has no right of access, enters the home "the homeowner also lacks the power to give effective consent to the search of the closed container.") Mr. Stewart argues that the jacket pocket was a closed container with a high expectation of

privacy, and that it was not reasonable for Agent Troiano to believe that Mr. Fernandez could authorize a search of that nature.

The facts taken into evidence at the hearing, however, do not support the argument that the jacket pocket was akin to a sealed container because it was not closed or even capable of being sealed. Agent Troiano testified that upon flipping through the clothing in the closet, he saw the money in the open pocket because the bulk of the money roll kept the pocket open and the money was readily apparent. He also testified that the pocket did not have a snap, button, or zipper. There were, however, other pockets in that jacket with snap and zipper closures where Mr. Stewart could have secreted the money, but he did not do so. Because Mr. Stewart kept the roll of money in an open pocket in a closet that was accessible to the co-tenants at the apartment, in an open pocket, and in such a way that it was visible to anyone accessing the closet, he cannot now claim that the fruits of the consented-to search should be suppressed.

Mr. Fernandez told Agent Troiano that Mr. Stewart had only been staying in the room for three days. It is objectively reasonable for Agent Troiano to have concluded that Mr. Fernandez's general consent included that closet because some or all of the clothing in the closet could have belonged to Mr. Fernandez. Furthermore, Agent Troiano testified that he discussed with Mr. Fernandez the reason for Mr. Stewart's arrest and his suspicion that Mr. Stewart was involved in an armed home invasion where money was stolen. Mr. Fernandez should have assumed that Agent Troiano would be looking for money. The Court finds that it was objectively reasonable for Agent Troiano to conclude that the general consent to search Mr. Stewart's room included consent to search items within that room that might contain money and it is further reasonable to assume that money is generally contained in a pocket. *See Jimeno*, 500 U.S. at 251 ("it was objectively reasonable for the police to conclude that the general

consent to search respondent's car included consent to search containers within that car which might bear drugs. A reasonable person may be expected to know that narcotics are generally carried in some form of a container"); *United States v. Melendez*, 301 F.3d 27, 33 (1st Cir. 2002) (legal to search item located in the area that third party had allowed the officers to search, and was a place in which the officers could have reasonably suspected drugs to be hidden so no additional authorization to search the item was required.) Therefore, the Court finds that the closet and pocket search were within the scope of Mr. Fernandez's consent and did not run afoul of Fourth Amendment protections.

### III. CONCLUSION

For the foregoing reasons, Mr. Stewart's Motion to Suppress (ECF No. 18) is DENIED.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
April 9, 2015